**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,      )
                                         )
          Plaintiff,              )
             v.                   )   Criminal Action
AARON MICHAEL BURNETT,     )   No. 09–03094-01-CR-S-DW
                                         )
          Defendant.         )

## REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

Defendant filed a Motion to Suppress Statements and Physical Evidence [Doc. # 18], to which the United States responded. [Doc. # 19]. The matter was set for an evidentiary hearing, which was held before the undersigned on July 7, 2010. The defendant was present with counsel, Shane P. Cantin, and the United States was represented by Randall Eggert, Assistant United States Attorney.

The government first called FBI Agent Monte Keiper. While he was in Springfield working at the Regional Office for the FBI, he had occasion to come into contact with defendant. He had received a lead from the Memphis office where a child pornography case was being investigated. The FBI was investigating a Mr. Satterly, who was suspected of distributing child pornography. The FBI conducted an interview with Mr. Satterly on November 9, 2007, during which time he admitted to trading child pornography with an internet name of "mom_daughter17." [Tr. 7]. The FBI seized Mr. Satterly's computer and the subsequent search revealed that there were messages trading child pornography with " mom_daughter17," and the person associated with that address had indicated

that they were a 40-year-old woman with a teenaged daughter willing to have sex with Mr. Satterly. The time frame for the communications was between March of 2006 and November of 2007, up to the time of Mr. Satterly's arrest. His internet name was "Apache1232000." [Tr. 9]. After executing a search warrant in that case, the FBI found an IP address for the Burnett residence in Halfway, Missouri. Agent Keiper was asked to interview the persons residing at the address in Halfway. Agent Keiper, together with Agent Ramaker, went to defendant's residence on June 18, 2008, as a result of this information. They interviewed defendant and his wife, and discussed their computer usage. Agent Keiper felt they wanted to stay together, and did not want to discuss things separately. The interview occurred during the day. Defendant and his wife were free to move about and were not arrested. He tried to talk to defendant and his wife separately, but he did not "want to push too hard," [tr. 11], so they did not have separate interviews. He did not Mirandize them. Mrs. Burnett told him that she mainly used the computer for bill paying and some chatting online, although she had not done that recently. She said they both used the computer, and their daughter had used it for homework. Apart from these people, no one else had used the computer. Defendant said he had done some chatting online. He thought it had been three or four months prior to June 18 that he had been online. He stated that he had actually received some child pornography, and had immediately deleted it. His chatting was less frequent then it had been in the past because of a back problem, which made it difficult for him to sit for long periods of time. The agents then left the residence.

On June 20, 2008, Agent Keiper testified that he went back to defendant's home because he did not feel that he had gotten the full story from him on the previous visit. He stated that it is common when a spouse is present for the other spouse not to be completely honest. His intention

was to go back and interview defendant separately from his wife. On this second occasion, he was not expecting defendant's wife to be home from work. When they got there, he saw that her car was there. He thought that defendant had apparently called her and she had come home from work. He took Agent Farnsworth with him on the 20th. He asked defendant if he would speak to him without his wife present. This conversation took place just inside the living room. He was in casual clothes, but did have a weapon, although it was not visible. Defendant asked him about what kind of gun he carried and where he carried it; the officer informed him that was not information he cared to share. Defendant indicated that he was willing to talk to Agent Keiper in private. They went outside into his driveway. Defendant was fairly calm and cooperative. Agent Farnsworth stayed inside to talk with Mrs. Burnett, so that Agent Keiper could speak to defendant alone. The agent testified that they talked right by the front door, perhaps about 20 feet away, by his vehicle, which was parked in the driveway. He did not take defendant into custody or restrict his movement or arrest him. He did not position himself in such a way that defendant would have felt trapped, nor did he touch defendant with his hands or fingers. Additionally, he never told defendant that "this will last as long as it takes for you to tell me the truth." [Tr. 18]. He did not notice that defendant appeared to be in any physical pain when they were talking. He had mentioned his back problems, and the officer thought that once they were back inside defendant had sat down, but he did not notice anything visibly. The officer testified that had defendant told him he was having physical difficulties, he would have found a place for him to sit down or gotten a lawn chair. Agent Keiper stated that defendant did not communicate a desire to speak to an attorney, nor try to call one on a cell phone. Again, had defendant indicated that he wanted to speak to or call an attorney, the officer testified that he would have let him do it. During the conversation outside, they talked about the

communication between "mother_daughter17" and "Apache1232000." [Tr. 19]. The officer laid out the information about what they knew and a lot of the evidence they had about trading child pornography. After this information was provided, defendant did confess that he was portraying himself as a 40-year-old woman with a teenaged daughter, and admitted that he had communicated with "Apache1232000." He said he first began trading child pornography in the past 12-15 months, and with Satterly within the past 12 months. He stated that he had sent and received images of child pornography. They probably talked 15-20 minutes. They then went back in the house, at which time Agent Keiper told defendant that he needed to tell his wife what he'd told the agent because there were three children in the house. Defendant was upset, but was pretty agreeable and cooperative. He agreed with the officer that he needed to tell his wife. He did not demonstrate any emotional distress or the inability to continue during the interview. If he had, Agent Keiper stated that he would have given defendant time to compose himself. The officer stated that he does this in an interview so that an individual will "speak with you freely." [Tr. 22]. Defendant told his wife what he had told the agent. The officer wanted to make sure that she knew everything defendant had told him, so he thought he added in a couple of things. Mrs. Burnett did not seem real surprised, and the officer assumed that she may have known to some extent what was going on. At this point, he asked for consent to seize the computer that was in the residence so they could search it. Both defendant and his wife were agreeable and signed the consent form, with Agent Farnsworth and Agent Keiper as witnesses. They took the computer and obtained the passwords. He specifically asked defendant if this was the computer that he had used to trade child pornography, and he said it was. He left without arresting defendant. As standard procedure, they made a hotline call to Social Services regarding the children.

On cross examination, the officer testified that on June 18, 2008, before he went to the Burnett residence, he did not recall making a phone call to either defendant or his wife to let them know he was coming. He stated that he did not push the issue of talking to defendant and his wife separately on that visit, and he thought it might be better to come back at a later time for that purpose. The information that he had received from Tennessee was that the IP address was registered to Mindi Burnett, and not defendant. He did not <u>Mirandize</u> either of them, nor did he tell them they were the targets of a criminal investigation regarding the distribution of child pornography. They did talk about the fact that he had an IP address from Tennessee that linked back to their address and involved child pornography, although he admitted that there is nothing in his report that stated this. He explained, however, that he does not put everything in his report. He asked defendant, during this interview, if he had received any child pornography. He told the officer that he had received a request for child pornography in the past, and had deleted the request. He did not state that he had received child pornography. He was there about an hour. On June 20, he called defendant before going back to the residence. In a brief telephone call, he asked if he could make some follow-up questions about the June 18th interview at the residence. He did not tell him he wanted to talk to him alone, but he just assumed that his wife would be at work. When they pulled up to the residence, he realized that defendant's wife was there, and figured that defendant must have called her. Agent Keiper planned to talk to defendant while Agent Farnsworth stayed with Mindi Burnett. The officers initially went inside. About five minutes later, Agent Keiper went outside with defendant. He just asked defendant "if he was willing to come outside and talk to me." [Tr. 36]. Prior to going outside, neither agent informed the Burnetts of their <u>Miranda</u> rights, nor did they inform them that they were suspected of having possessed, received, or distributed child

pornography. The officer stated that both he and defendant were standing next to the vehicle, alongside the driver's side door. He thought the vehicle was facing towards the house. If he recalled correctly, he thought defendant was positioned where he was closer to the house, and Agent Keiper was further away from the house, towards the back of the vehicle. During this 15 to 20 minutes that they talked, they stayed by the vehicle. There was no time when he was positioned in front of defendant and the car was behind him, or that defendant was in a position where he could not move away. He did not handcuff or arrest defendant during the June 20 interview. He never touched defendant's arm or shoulder, and never poked him. He never told him that he would be arrested if he did not speak to him; he never told defendant that he would call Social Services to come and take custody of the children; he never suggested that he had a warrant or that he would leave and come back with a warrant if necessary; and he never said that the interview would last as long as necessary for him to admit what he did. The officer testified that he had never said that in an interview. Defendant never sat down or sat on the car, and he did not recall him leaning against it. He was generally aware of defendant's medical conditions from the June 18 interview. Agent Keiper testified that defendant spoke calmly and voluntarily. He never said he was in pain or discomfort. He never said he wanted to call a lawyer, nor did he remove his cell phone and attempt to make a phone call. Agent Keiper testified that he never took his cell phone from him. When they went back into the house, he wanted defendant to make his wife fully aware of what he had admitted, and the officer thought he added some things to ensure that she knew everything.

On redirect, the officer testified that when he interviewed defendant on June 20, he said he'd received approximately 50 to 100 images of children between 8 and 15. He further stated that he had distributed approximately 50 images with children under 13 showing sexual acts to other unknown people. The officer did not provide the ages; he asked what ages defendant thought they

were, and he provided the ages.  Agent Keiper reiterated that he did not threaten defendant about having the  children taken by family services, because that kind of threat would have discouraged him from talking.  It would have suggested that the situation was more serious, and the officer wanted to keep it more low key.

The government next called Special Agent Kevin Farnsworth to the witness stand. He is a special agent for the Bureau of Alcohol, Tobacco, and Firearms ["ATF"].  He was working with the ATF on June 20, 2008, and was asked by Agent Keiper to accompany him to defendant's residence. He was asked to do this primarily for officer safety, and additionally, with two officers present, it would allow defendant and his wife to be separated where a more effective interview could be conducted.  He assisted by staying with Mindi Burnett while defendant spoke with Agent Keiper. He heard the agent ask defendant to accompany him outside.  It was very low key; defendant was very cooperative. Agent Keiper did not threaten defendant or touch him.  His wife was also very matter of fact.  He did not observe Agent Keiper make any kind of threat or implied threat against defendant.   Additionally, Agent Farnsworth did not make any threatening statements to coerce defendant to go outside, nor did he make any against Mrs. Burnett.  Agent Farnsworth stayed inside with the wife in the living room. He did not really talk about much with Mindi; they made small talk. There was no attempt by him to interview her.  Defendant and Agent Keiper came back inside between 15 to 30 minutes later. They summarized to Mindi Burnett what defendant had said, with defendant primarily doing the speaking. Defendant essentially told her that he had  been trading in child pornography with an individual whom he did not know, but had met through the Internet.  He also mentioned that he had problems with arthritis and was therefore home with a lot of time on his hands.  Defendant was calm, and his wife reacted in a calm fashion.  Agent Farnsworth never saw Agent Keiper touch or in any way intimidate defendant after they had reentered the residence.

Agent Farnsworth testified that Agent Keiper's "demeanor was the same after he came back into the house as it was when he left the house." [Tr. 50]. After this conversation, he saw both defendant and his wife fill out the consent form to seize the computer. No one made any threats to have them do this. Neither of the Burnetts were arrested; rather, they remained at the residence after the officers had left with the computer.

On cross examination, Agent Farnsworth testified that he had not been actively involved in this case prior to arriving at the residence on the 20th of June with Agent Keiper. He recalled that there was at least one child there. He did not recall anyone else arriving while they were there.

Defendant called Mindi Burnett to the witness stand. She is married to defendant, and has two children, although she and defendant have no children together. In June of 2008, FBI agents came to their house twice. Agent Keiper was there on both occasions, as was she. She works with the Department of Social Services as an eligibility specialist. On June 18, two agents showed up at their door. They talked inside the house, and the children were present. Mrs. Burnett thought they were there less than an hour. The officers said something about illegal activity on a computer, and asked general questions about them and how they used their computer. It was not explained to them that there was an IP address from Tennessee, used in trading child pornography, which had been traced to their residence. It was never portrayed to them that they were the targets of an investigation. The officers asked about neighbors and people having access to their computers. They were never <u>Mirandized</u>, placed under arrest, or told they could seek legal counsel. They were specifically told they were not in trouble and were not under arrest.

Mrs. Burnett testified that two agents came back on the 20th of June. That interview was set up when they called her husband ahead of time. He called her at work, and she went back to be with him. She got home before the agents arrived at the residence. When they got there, they came

inside. This time they were at the house a lot longer; she thought it was between an hour and two hours. At some point, she was left with the other agent and defendant went outside with Agent Keiper. Neither advised them that they were suspects or that they were in any trouble or advised them of their <u>Miranda</u> rights. There were no threats made that they were in trouble at this point. She stayed with Agent Farnsworth the whole time; they just talked about meaningless things. He asked general questions about the computer. She did not ask him what was going on. At some point, her in-laws arrived to pick up the children; this was pre-arranged. She thought they arrived shortly after defendant had gone outside with Agent Keiper. They left the residence with the children; she thought that occurred right after her husband and the agent came back inside. She did not have an opportunity to talk to them about what was going on. Mrs. Burnet testified that she could not see anything outside. She could not remember if her husband was on disability at the time, although he had applied for it. When Agent Keiper and her husband came back inside, defendant acted like he was in a daze, and like he could not believe what had happened. Defendant did not say or do anything except to shake his head and say, "no." [Tr. at 65]. The agent told her what defendant had "supposedly confessed to. . . ." [<u>Id</u>.]. Defendant did not tell her anything about trading child pornography. The four of them were together less than 20 minutes. There was a discussion about them taking their computer to search for evidence. They were not informed of their <u>Miranda</u> rights. The officers asked them to sign a consent to take the computer and search it, but did not really explain what this meant. They never threatened to get a warrant. Mrs. Burnett testified that she did not remember that they made any threats at all.

On cross examination, Mrs. Burnett admitted that she was not present when defendant was outside with Agent Keiper, and she did not see anything. Prior to defendant and Agent Keiper going outside, she admitted that the agents were professional and courteous. She did not see either agent

touch her husband or "manhandle" him.  [Tr. 68]. There was no yelling or screaming.  Her in-laws pulled up during the time the agent and defendant were outside; she does not know where they were when they were out of the car.   They did not come up to the house.   During the time the officers were present, she never saw the in-laws.   When her husband came back inside the house, he appeared to be "dazed." [Tr. 71].  Saying "no" appeared to be him saying that what Agent Keiper was relaying was not true.   He said this audibly, and Agent Keiper did not acknowledge this, even though her husband was denying what the agent was saying.  On June 18, she admitted to the officers that defendant had had an online relationship with a woman, and she had to end it.  She never used the IP address of "mom_daughter17," although she had been told that the address came back to their computer by the Internet service provider.  She did not obtain that address.   She did tell the officers that she, her husband and the children were the only regular users of the computer.

Defendant next called Rebecca Burnett. She is defendant's mother.  On June 20, 2008, she and her husband were going to the residence to pick up the children to take them for ice cream.  This was a plan that had been set up in advance.  They arrived a little after lunch.  Prior to arriving there, she was aware that federal agents had been there before.  She recognized, when she arrived, that one of the vehicles was not her son or daughter-in-law's. They parked right beside that vehicle.   Her husband walked around to the front of his  car, and she went and sat down on the porch.   They saw defendant and a man she did not recognize coming down off the porch. They went to the front driver's side fender.  She was about ten to fifteen feet from where they were positioned, from where she sat on the porch, and could hear the conversation that was occurring.  Her husband stayed by his vehicle, and was about a car length away from defendant and the agent.   She sat on the porch for the entire time the conversation was taking place,  listening to it. She heard the officer tell defendant

that "he knew he had been on chat with some guy called Apache and that he needed to go ahead and confess, because they all knew he did it." [Tr. 80]. This was repeated over and over again, and defendant kept denying it. Rebecca Burnett testified that the agent had defendant up against the car, had his finger poking him in the chest, and kept doing this harder until defendant was bent over the back of the car and his cane fell. The agent was very close to him. Her son would not have been able to back up or move to the side to get away from the agent if he had wanted to. Defendant repeatedly told the agent to stop, that it hurt, and that he was in pain. She also heard her son say that he wanted to call a lawyer. The agent said he did not need one. Defendant took out his cell phone to call an attorney and the agent took it and slapped the phone on top of the car, saying he did not need an attorney. Defendant kept telling him that he wanted an attorney. The agent was very bullying. "He was very harsh, very cold, very uncaring, very, you know, it's going to be okay if you cooperate type attitude, but very forceful." [Tr. 83]. She heard the entire conversation. Her husband was at the front of their vehicle for the first part of the conversation, but then the agent told him to move. She heard the agent say that he would arrest defendant if he did not cooperate; that he had a warrant and not to make him use it; and that if he did not cooperate and sign the paper, "he would handcuff him, call DFS and have his children taken out screaming and kicking." [Tr. 84]. One of the children was outside on the porch with her during the conversation.

On cross examination, the witness stated that her husband was actually closer to the conversation than she was. She did not knock on the door, but stayed there on the porch to hear what was going on. She never asked either of them what was going on when she first saw them. She sat on the porch and could hear and see very clearly. She considered the officer's actions to be inappropriate and unprofessional for a law enforcement officer, but she did not intervene. They

never made any complaints. The only person she told about what had happened was defendant's attorney.

Defendant next called Robert Burnett. He is defendant's father. They did not know federal agents were going to be there when they arrived on the 20th. When they pulled up, they parked behind the FBI car, about 10-15 feet away from it. As they were exiting the vehicle, they saw Mr. Burnett's son and the agent coming out of the residence. He went to the front of his vehicle and leaned against it; his wife went to the porch. He knew agents had been out there before. He made the assumption that the agent was law enforcement. He stayed there at the front of his vehicle to watch what was going on. He was not more than 15 feet away and could see and hear everything. The agent had defendant up against his car with his back to it, and he was questioning him face-to-face, very close. His back was always to the vehicle. He described the agent's demeanor as "[s]erious, firm, somewhat demanding." [Tr. 96]. The agent was asking defendant questions about a man named "Apache," and then said they knew he did it. [Id.]. Mr. Burnett thought the agent used excessive verbal force to get defendant to talk. He thought the conversation took place over about 30-40 minutes, and he observed all of it. He saw the agent get in defendant's face and poke him with force repeatedly in the chest. Defendant was leaning further and further back over the car, while the agent kept telling him that "you are going to sign this." [Tr. 97]. This took place more at the end of the conversation. Mr. Burnett testified that he kind of adjusted his posture, and the agent told him to move over by the porch, which he did. He had no intention of interfering with the interview. He heard the rest of the conversation from there, and said that the agent brought up having a warrant. He told defendant that he could surrender the computer right then, or if the agent had to use the warrant, he would arrest him, call family services, and have his children taken away

for a long time. It was Mr. Burnett's testimony that the agent was "beating him in the chest the whole time." [Tr. 99]. Towards the end of the encounter, defendant, who had his back arched over the car the whole time, told the agent that he was hurting him. Mr. Burnett testified that his son asked the agent three times if he needed an attorney. He heard the agent tell him that he did not, and also saw him take defendant's cell phone and place it on top of the vehicle. The agent was very forceful that defendant was going to sign some piece of paper. Mr. Burnett stated that the agent pulled defendant off the car, spun him around, held his arm, and forced him to sign the paper. The agent and defendant went inside; he heard the agent say that he had gotten a confession, and defendant said, "like hell you did." [Tr. 101]. When he went inside to let them know that they were taking the children to get ice cream, he saw one other agent sitting on the couch.

On cross examination, Mr. Burnett reiterated his testimony from direct examination. He admitted that he and his wife separated to see what was going on. He was closer. He would call this excessive force, but he admitted that he did not go up to the officer to intervene. Even though they were in the house with the door shut, he did not stay. He left to take the grandchildren to get ice cream. He never made any complaints or reported this incident.

On redirect, Mr. Burnett testified that he contacted his son's attorney immediately after this event. He explained that he went ahead and took the children because the agent threatened to call family services to come take them.

It is defendant's contention that Agent Keiper never informed him of his Miranda rights, even though he requested permission to call his attorney several times during the questioning, and was denied the opportunity to do so. He asserts that his back was forced up against a patrol vehicle and he was repeatedly poked in the chest, even though the officer knew he had a degenerative spinal

13

condition and rheumatoid arthritis. Defendant also contends that his cell phone was physically taken from him, and that he was threatened with removal of his children from the home by Children's Services if he did not cooperate. He submits that at the end of the interrogation, he was told that he and his wife would have to sign a consent to seize the computer and to examine the hard drive, or else he and Agent Keiper would go back outside to continue their conversation. He asserts that neither he nor his wife were advised of their <u>Miranda</u> rights; that neither were given an opportunity to contact legal counsel; and that the agents did not have a search warrant to seize or examine the computer. It is defendant's position that the statements made by him and the subsequent consent to seize were the direct result of improper and coercive tactics by Agent Keiper, and were not voluntarily made. Therefore, he seeks suppression of any and all alleged statements made and all contents obtained or discovered from examination of defendant's computer.

It is the government's position that defendant was not in custody at the time he was questioned by the officers in this case. The government also asserts that because defendant's confession was not coerced, his subsequent consent to allow a search of his computer was freely and voluntarily given.

Pursuant to <u>Miranda v. Arizona,</u> 384 U.S. 436, 444-45 (1966), a defendant's Fifth Amendment privilege against the inherently coercive effects of custodial interrogations must be protected. A person "must be advised of the right to be free from compulsory self-incrimination, and the right to the assistance of an attorney, any time that a person is taken into custody for questioning." <u>United States v. Griffin,</u> 922 F.2d 1343, 1347 (8th Cir. 1990). While law enforcement officers may speak with a person who is not in custody without advising the person of his <u>Miranda</u> rights, the Court must consider the totality of the circumstances in determining whether a person is

actually in custody.  Id. at 1347.  "Custody occurs either upon formal arrest or under *any other circumstances* where the suspect is deprived of his freedom of action in *any* significant way."  Id. (emphasis in original), citing Miranda, 384 U.S. at 344.  In determining whether an individual is in custody for Miranda purposes, the Court should examine a number of factors including: the length of the interrogation; the accused's freedom to leave the scene; and the place and purpose of the interrogation.  Griffin, 922 F.2d at 1349.  Additionally, the Court may consider whether the person was informed that the contact was voluntary and that the suspect was free to leave; whether the subject was restrained; who initiated the contact; whether police used "strong arm" tactics and/or dominated the questioning; and whether the person was placed under arrest at the end of the questioning.  Id. Ultimately, however, whether a custodial situation exists "depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned."  Stansbury v. California, 511 U.S. 318, 323 (1994).

In weighing all the factors under Griffin, and based on the totality of the circumstances, the Court concludes that defendant was not in custody for purposes of being advised of his Miranda rights during the interview on June 20th.   The fact that defendant was outside alone with Agent Keiper standing by the police vehicle while they talked is not, in and of itself,  an inherently coercive situation.  There was no credible testimony that defendant did not voluntarily accompany Agent Keiper outside.  They were at his residence, in his driveway, during the day.  The agents had called ahead of time to schedule the visit.  There was no testimony from defendant's wife that her husband did not freely accompany Agent Keiper outside to speak with him.  In fact, she testified that there were no threats made that they were in any trouble.  She sat inside and basically chatted with Agent Farnsworth while her husband was outside.  Admittedly, defendant's situation was somewhat unique

in that he had no experience with law enforcement and he suffered from physical disabilities, which may have made standing for a lengthy period of time more difficult. Agent Keiper credibly testified, however, that he would have allowed defendant the opportunity to sit, had he requested to do so. The conversation, according to the officer, took about 20 minutes, and the officer's intention in speaking to defendant outside was to allow them to speak in private, away from defendant's wife. The Court believes that the officer credibly testified about his interviewing techniques, and stated that he thought strong arm tactics would have been less productive in this case, and could have caused defendant to clam up entirely. Additionally, the length of time that the two spent outside, whether it was the agent's approximation of 15-20 minutes, or the estimate of 40 minutes by defendant's parents, is not so long as to suggest that defendant's will was worn down over an expanse of time, even if he were in some physical discomfort. The officer candidly admitted that he did question defendant about child pornography on his computer. Because he was not in custody, however, the questions did not produce answers that were the product of an illegal interrogation. Not advising defendant that any oral statements could be used against him, under these circumstances, cannot be deemed to rise to the level of "strong arm tactics," or police domina[tion]." Griffin, 922 F.2d at 1349. Because defendant was not in custody and because no custodial interrogation occurred, the Court finds that the police officer was not required to administer Miranda rights in this case. There was not an inherently coercive environment, given that defendant was in his own home and the curtilage of his home; his wife was present inside the house; the time he was interviewed was not extremely long; the atmosphere was described as cooperative and calm; and defendant was not arrested at the conclusion of the interview.

The Court is mindful of the testimony of defendant's mother and father regarding how they

perceived the events that occurred that day, which are completely at odds with the rendition provided by Agent Keiper, and even somewhat inconsistent with the testimony of defendant's wife. For example, she repeatedly testified that defendant never spoke, except to say "no," when they came in from outside.   Defendant's father testified, however, that he heard defendant say, "like hell you did," when the agent walked in and stated that he'd gotten a confession. [Tr. 101].   Defendant's wife testified only that he appeared "dazed," when he came back inside. [Tr. 71].   According to the description by both parents, defendant was assaulted, brutalized, threatened and coerced.   His father actually stated that he was beaten in the chest, and then he was  grabbed, spun around, and his arm was forcibly held while he was forced to sign a paper. According to the testimony of defendant's wife, once Agent Keiper and her husband were back inside, the agent presented them both with the consent to seize form, and they both signed it in front  of the two agents.   There was no testimony that her husband had already signed the form.   Additionally, Agent Farnsworth testified that he saw both defendant and his wife fill out the consent form to seize the computer and that no one made any threats to have them do this.   This conforms with Agent Keiper's testimony.   Both parents testified that defendant repeatedly invoked his right to counsel.   His wife never made any mention about being concerned regarding calling an attorney.   It is clear from the testimony of Agent Keiper that he is experienced in conducting interviews, and used certain tactics to ensure that he would not intimidate defendant.   It is simply not believable that he would have flagrantly ignored the invocation of the right to counsel.   It is not unnatural that these parents would be concerned about their son, but  when the Court is called upon to assess credibility, it must make a judgment call based on a common sense review of the testimony, with the competing interests of the witnesses in mind. To believe that Agent Keiper physically intimidated and assaulted and mentally and emotionally

abused defendant with threats and violence, in plain view of his parents, simply stretches credulity to the breaking point.  The Court has considered the testimony of the witnesses in its entirety, and finds that Agent Keiper's version of the facts is simply more credible.  In making this determination, the Court has carefully reviewed all the evidence, and must emphasize that not only did the officer testify with what appeared to be veracity, defendant's wife made several statements that reveal that the atmosphere was not dominated by an overbearing police presence.  Mrs. Mindi Burnett testified that she did not remember that the officers made any threats at all. She had had two occasions to see Agent Keiper, and never expressed any concern about his demeanor or treatment of them.  While she testified that she came home on the 20th when her husband called to tell her Agent Keiper was coming back, she merely stated that she wanted to be there, but did not indicate that she felt her presence was necessary because she was afraid of the agents or what might happen.  She also admitted, on cross examination, that the agents were professional and courteous. She stated that there was no yelling or screaming or touching.  While she was not present when her husband was outside with Agent Keiper, and could not see what was going on, Mindi Burnett did suggest, through her testimony, that there was no police intimidation on the day in question.  She did not indicate that she felt that either she or her husband were not free to curtail the interview had they wanted to do so.  Based on the various factors delineated herein, the Court finds that defendant was not in a custodial situation when the interview occurred, and that there was no constitutional violation under Miranda .

Regarding the consent given by defendant to seize the computer, the Eighth Circuit Court of Appeals has enunciated a number of factors to determine whether consent has been voluntarily given.  United States v. Chaidez, 906 F.2d 377, 381 (8th Cir. 1990).  Some of the factors relating to

the person giving consent include age, general intelligence and education, prior experience with law enforcement, and whether he or she was under the influence of drugs or alcohol such that would cause mental impairment.  See United States v. Mancias, 350 F.3d 800, 805 (8th Cir. 2003) (internal citations omitted).  Conduct of law enforcement to be considered includes the length of the detention, whether there was physical intimidation, if the defendant was in custody or under arrest, if the police made promises or misrepresentations, if the interrogation was in a public place, and whether the accused objected to the search or stood by silently.  Id. at 805.

After carefully reviewing the evidence, the Court concludes that defendant voluntarily consented to the seizure of the computer.  The testimony of Agent Keiper, of Agent Farnsworth, and that of defendant's wife support this conclusion.  Mindi Burnett testified that no threats were made to force them to consent to the seizure, and only complained that the officers did not really explain the consent form.  She never testified that she did not understand what was being asked of them.  The Court believes that she honestly testified that they voluntarily signed the form together, in the house, after defendant came back inside.  Additionally, she never described any symptoms of distress, physical trauma, or emotional injury that would suggest that defendant was not capable of making a voluntary decision to sign the consent to seizure form.   She never mentioned that there was a threat to call Children's Services, and expressed no concern or fear for the well-being of her children or her husband.  Neither of them were in custody or arrested when they signed the consent form.  Therefore, it is the Court's conclusion that the consent to seize the computer was voluntarily given.

After having fully reviewed the record, and based on the totality of the circumstances, the Court finds that defendant's statements to the officer and the seizure of the computer were not the

product of custodial interrogation occurring in violation of <u>Miranda.</u>

     Based on the foregoing, the Court finds that it must be recommended that defendant's Motion to Suppress Statements and Physical Evidence  be denied.

     Therefore, it is, pursuant to the governing law and in accordance with Local Rule 72.1 of the United States District Court for the Western District of Missouri,

     RECOMMENDED that defendant's Motion to Suppress Statements and Physical Evidence be denied.

 /s/ James C. England
JAMES C. ENGLAND
United States Magistrate Judge

Date:  8/2/10